CCR Data v. Panasonic                    CV-94-546-M    01/31/95
                UNITED STATES DISTRICT COURT FOR THE
                     DISTRICT OF NEW HAMPSHIRE


CCR Data Systems, Inc.,
     Plaintiff,

          v.                                    Civil No. 94-546-M

Panasonic Communications & Systems
Company, Division of Matsushita
Electric Corporation of America,
     Defendant.


                            O R D E R


     CCR Data Systems, Inc. ("CCR"), initiated this civil

proceeding against Panasonic Communications & Systems Company

("Panasonic") seeking a preliminary and permanent injunction and

damages.  CCR began this action in the Merrimack County (New

Hampshire) Superior Court, but Panasonic removed it to this

court.  Jurisdiction is based upon diversity of citizenship and

an amount in controversy alleged to be in excess of $50,000.00.

28 U.S.C. §1332.  Before the court is CCR's motion for

preliminary injunction, by which it seeks to restrain Panasonic

from "terminating and/or reassigning the Massachusetts and Rhode

Island territories currently serviced by CCR."

I.   Standard of Review.

In order to obtain the extraordinary relief of a preliminary injunction, CCR must demonstrate: (i) a likelihood of success on the merits at trial; (ii) that it will suffer irreparable harm if the relief requested is not granted; (iii) that the harm to CCR if the relief is not granted outweighs any harm such relief would inflict upon Panasonic; and (iv) that the public interest will not be adversely affected by granting the requested relief. Fed.R.Civ.P. 65; Planned Parenthood League v. Belotti, 641 F.2d 1006, 1009 (1st Cir. 1981); Avery v. Powell, 695 F.Supp. 632, 642 (D.N.H. 1988).

II.  Factual Findings.

Effective November 1, 1986, CCR (then known as Capitol Cash Register Company, Inc.) entered into an Exclusive Dealer Agreement with Panasonic (the "Agreement").[1] Panasonic manufactures, among other things, electronic point of sale ("POS") terminals, which are employed in the hospitality industry to place and track food orders. The Agreement provided that CCR

_____

[1] Based upon the materials presently before the court, the terms of the Agreement appear to have remained substantively the same for each year that it has been in effect. However, as discussed more fully below, Exhibit B to the Agreement has been modified to alter CCR's "Prime" and "Open" territories.

2

would act as Panasonic's exclusive dealer in geographic regions designated "Prime," and its non-exclusive dealer in regions designated "Open." Agreement, ¶2. The Agreement also provided that Panasonic could, in its sole discretion, "make any deletion from, amendment or addition to, or modification or substitution of" CCR's "Prime" and/or "Open" Territory. Agreement, ¶1.2. In 1986, the Agreement listed the following regions as CCR's Prime Territory: New Hampshire, Vermont, Maine and specified counties in Massachusetts. Agreement, Exhibit B.

The Agreement provided that it would be renewed automatically each year for successive one-year terms, unless terminated by either party in writing. Agreement, ¶16.1. Either party could terminate the Agreement, with or without cause, by providing the other with written notice of such termination not fewer than thirty (30) days prior to the Agreement's scheduled termination date. Agreement, ¶16.1 The Agreement also states that it shall be governed by and interpreted in accordance with the laws of the State of New York. Agreement, ¶21.

In 1990, Exhibit B of the Agreement was amended to expand CCR's Prime Territory to include Massachusetts and Rhode Island.

3

CCR devoted substantial resources to promoting and marketing Panasonic's POS terminals in its assigned territories. Its efforts were rewarded in 1994, when it landed a substantial account with a restaurant chain operated by Daka, Inc., popularly known as "Fuddruckers." Nevertheless, beginning as early as 1991, Panasonic expressed concerns with CCR's lack of adequate sales representation in the Rhode Island and Massachusetts territories. Panasonic repeatedly informed CCR that it expected CCR to hire additional sales staff to fully cover the Massachusetts and Rhode Island territories. In a memorandum dated July 9, 1991, John Tata, former president of CCR, acknowledged Panasonic's concern about CCR's inadequate presence in the Massachusetts market, and cautioned his sales representatives that, "[t]ime is running out. If we do not start to deliver immediately, we will give Panasonic no alternative but to find someone who will." Defendant's Exhibit C.

CCR argued that it was having difficulty marketing Panasonic POS terminals, particularly in the Massachusetts territory, because of the substantial and well entrenched presence of Micros, a manufacturer of POS terminals that competed directly

4

with Panasonic.[2]  CCR told Panasonic that until Panasonic developed and released a POS terminal with touch sensitive screens, like those sold by Micros, it would have great difficulty marketing Panasonic's products in the Massachusetts territory.  Nevertheless, Panasonic continued to pressure CCR to increase its sales staff and its presence in the Massachusetts and Rhode Island territories.

Dissatisfied with CCR's sales performance in the Massachusetts and Rhode Island territories, Panasonic notified CCR in August of 1992, that it had changed the Massachusetts and Rhode Island territories from "Prime" to "Open," thereby removing CCR's status as exclusive Panasonic dealer.  Panasonic did, however, permit CCR to retain three substantial accounts in those territories as "Prime," including the Fuddruckers account. Despite CCR's request that Panasonic revisit this decision and restore Massachusetts and Rhode Island as "Prime Territories," Panasonic's decision remained unchanged.

---

[2]  As of at least 1991, CCR was also an authorized dealer of Micros equipment.

In 1993, Panasonic sent a new Dealer Agreement to CCR for execution because CCR had changed its corporate name from Capitol Cash Registers, Inc. Panasonic apparently wanted an executed Agreement employing the current corporate identity. Despite the 1992 change of status with regard to the Massachusetts and Rhode Island territories, Exhibit B to the new Agreement erroneously listed Massachusetts and Rhode Island as "Prime" rather than "Open" territories. The court finds as a factual matter that the redesignation was an inadvertent clerical error on the part of Panasonic, and did not represent either an agreement or an understanding between the parties. In fact, CCR continued to treat the Massachusetts and Rhode Island territories as "Open" and repeatedly requested Panasonic to restore those territories to their former "Prime" status. See, e.g., Plaintiff's Exhibit 18 (May 25, 1993 letter from John Tata of CCR to Dan Cox of Panasonic, stating that CCR "expects exclusivity to be reinstated for Massachusetts and Rhode Island."); and Exhibits 43 and 46 (CCR business plans dated July 27, 1994 and August 12, 1994, respectively, which provide that CCR plans to meet "the Panasonic requirements for reclassifying the state [of Massachusetts] as `Prime Territory' assigned to CCR."). CCR did not rely on the clerical error in believing that territory to be anything but

6

"Open," and understood that it remained "Open." The court finds that as of August, 1992, and continuing through September of 1994, the Rhode Island and Massachusetts territories were "Open," and CCR operated as a non-exclusive Panasonic dealer in those territories.

Concerned by what it thought to be an unacceptable sales performance and presence in the Massachusetts market, Panasonic asked CCR to prepare and submit a business plan addressing those concerns. In early 1994, dissatisfied with CCR's failure to hire additional sales staff to work the Massachusetts and Rhode Island territories, Panasonic began exploring the possibility of securing other sales representatives for the Massachusetts territory. On July 5, 1994, representatives of Panasonic and CCR met to discuss how CCR might meet the expectations of Panasonic and better represent Panasonic's interests in the Massachusetts territory. Again, Panasonic asked CCR to submit a business plan aimed at improving Panasonic's penetration of the Massachusetts market. Panasonic counseled CCR that "time was of the essence" and again expressed concern about CCR's unfulfilled promises regarding the Massachusetts territory.

In a Memorandum summarizing what transpired at that meeting, Joe Counter of Panasonic wrote:

> Joe showed maps of the geographic distribution of restaurants in CCR's territory and discussed the meeting summary from July 14, 1993 in which CCR committed to hire two additional salesmen to cover the Boston metro area and to establish representation in Central and Western Massachusetts. Panasonic has decided that Massachusetts will remain "Open Territory" until these coverage improvement are implemented and that four Western counties will become "Prime Territory" of Dumac Business Control Systems.

Plaintiff's Exhibit 38, Memorandum dated July 14, 1994, from Panasonic to CCR (emphasis added). CCR argues that this memorandum confirmed to CCR "that Massachusetts would at least `remain Open Territory . . . until coverage improvements [were] implemented.'" Plaintiff's Post Trial Memorandum of Law at 11. Accordingly, CCR argues that it reasonably relied upon this language in the memorandum and proceeded in good faith to meet Panasonic's expectations. However, also in that memorandum, Panasonic specifically warned CCR that, "For Massachusetts to become CCR `Prime Territory', <u>or even to remain under CCR</u>, Panasonic must receive a workable, written business plan, ASAP, with definitive milestones to measure progress." Plainly, Panasonic was not willing, nor had it committed itself, to wait

8

indefinitely for CCR to address its longstanding and clearly expressed concerns.

CCR submitted a business plan dated July 27, 1994, which Panasonic found unacceptable. CCR then submitted a revised business plan, dated August 12, 1994, which it hoped would address Panasonic's concerns. It did not. Toward the end of August, 1994, Panasonic decided to solicit a business plan from another company, ERC. Panasonic asked ERC to submit a business plan by September 7, 1994, directed toward augmenting Panasonic's presence in the Massachusetts territory. After reviewing ERC's business plan, Panasonic initially decided to award ERC the Massachusetts and Rhode Island territory. A letter notifying CCR of that decision was drafted on September 12, 1994, but was never sent. CCR had heard of Panasonic's solicitation of others and expressed its objection. Accordingly, Panasonic decided to postpone its decision until the end of September. Panasonic formally notified CCR of its decision to solicit proposals and business plans from others and to make a final decision regarding the Massachusetts territory at the end of September. See Plaintiff's Exhibit 53. Panasonic also told CCR that it would have an opportunity to meet with Panasonic officials in Chicago

9

before Panasonic made any territorial changes.  However, CCR was never given that promised opportunity to meet with Panasonic.  On September 23, 1994, Panasonic orally notified CCR that it had decided to assign the Massachusetts and Rhode Island territories to another dealer as "Prime Territories."  On September 27, 1994, Panasonic provided CCR with written notice of that decision.

CCR asserts that Panasonic "embarked on a course of deceptive conduct" in deciding, ultimately, to assign Massachusetts to ERC as "Prime Territory," but the evidence in support of its claim is, at best, ambiguous.  CCR claims that Panasonic had already decided, on or before September 12, 1994, to award Massachusetts and Rhode Island to ERC, and it makes much of the fact that Panasonic did not inform it of its decision until September 23, 1994.  Panasonic argues that as of September 12, 1994, it had not yet reached a final decision and had put "on hold" its initial decision to award ERC Massachusetts and Rhode Island.

Despite having awarded the Massachusetts and Rhode Island territories to ERC, Panasonic maintained a business relationship with CCR; CCR remains an exclusive Panasonic dealer in New

10

Hampshire, Vermont and Maine.  And, at a national conference in October, 1994, Panasonic acknowledged the substantial sales activity generated by CCR with two awards for its efforts.  CCR suggests that because it had exceeded the sales objectives which Panasonic had set for it, it reasonably expected that it would retain the right to market Panasonic POS systems in Massachusetts and Rhode Island.  It claims that Panasonic's awarding of Massachusetts and Rhode Island territories to ERC constitutes a breach of the Exclusive Dealer Agreement and a breach of the implied covenant of good faith and fair dealing implicit in every contract.

III. Discussion.

A.  Choice of Law.

Because this action is before the court based on the parties' diverse citizenship, the court is guided by New Hampshire's choice-of-law principles.  28 U.S.C. §1332; Fragoso v. Lopez, 991 F.2d 878, 886 (1st Cir. 1993) (citing Erie v. Tompkins, 304 U.S. 64, 78 (1938)); K.J. Quinn & Co. v. Continental Casualty, 806 F.Supp. 1037, 1040 (D.N.H. 1992).  In contract cases, New Hampshire follows the approach adopted by the Restatement (Second) of Conflict of Laws, which provides that

11

where parties to a contract select the law of a particular jurisdiction to govern their affairs, that choice will be honored "if the contract bears any significant relationship to that jurisdiction." Ferrofluidics Corp. v. Advanced Vacuum Components, Inc., 968 F.2d 1463, 1467 (1st Cir. 1992); Allied Adjustment Service v. Heney, 125 N.H. 698, 700 (1984) (citing Restatement (Second) of Conflict of Laws §187).

Here, the Exclusive Dealer Agreement provides that it shall be governed by, and interpreted in accordance with, the law of the State of New York. Agreement, ¶21. However, the court finds that the Agreement fails to "bear any significant relationship" to the State of New York. CCR is a New Hampshire corporation. Panasonic is a Delaware corporation with a principal place of business in Wood Dale, Illinois. Agreement, ¶20. In support of its argument that New York law should apply, Panasonic states that:

> Panasonic is a national manufacturer with many regional dealers serving its distribution network. New York law was chosen as the governing law in its Exclusive Dealer Agreement which it utilizes for all of its dealers. New York commercial law is a well-developed body of law, particularly in the area of distributorship agreements, which is often looked to for guidance by the courts of other states. Since Panasonic does business in every state in the United States, it was

12

> not unreasonable for the Agreement to provide that the
> law of only one of the fifty states in which Panasonic
> does business would govern all of its dealer
> agreements, so that they would be construed with
> uniformity.

Defendant's Memorandum of Law in Opposition to Motion for Preliminary Injunction at 14. While Panasonic's choice of New York law may not have been "unreasonable" and was aimed at securing uniform interpretation of Dealer Agreements, such a basis for choice of law, without more, is insufficient. There must be some significant relationship between the particular Agreement and the State of New York. Here, such a relationship is lacking. In fact, there appears to be no nexus between the State of New York, these parties, and this particular contract. See Ferrofluidics, 968 F.2d at 1467.

The court finds that the parties neither contemplated nor actually conducted any significant business through or involving the State of New York. CCR alleges (and Panasonic does not dispute) that virtually all communications between CCR and Panasonic were to or from CCR's New Hampshire and Massachusetts locations and to or from Panasonic's offices in Georgia and Illinois. The court finds that, for the purpose of selecting the appropriate law to govern interpretation and enforcement of the

13

Agreement, New Hampshire has the most significant relationship to the Agreement. Accordingly, the court will apply New Hampshire contract law in evaluating CCR's claims.

B. Breach of Contract.

CCR's breach of contract count is based exclusively upon its argument that the Agreement, as amended in 1993 by Exhibit B (which erroneously listed Massachusetts and Rhode Island as CCR's "Prime Territory"), precluded Panasonic from granting any other dealer the right to sell Panasonic products in Massachusetts and/or Rhode Island. Verified Petition for Preliminary and Permanent Injunction, Count I at ¶¶44 and 45. As the court has previously found, however, Exhibit B's designation of territories was incorrect due to clerical error, an error upon which neither party actually relied; after 1992, neither Panasonic nor CCR understood the Massachusetts or Rhode Island territories to be "Prime Territories" of CCR.

Because Massachusetts and Rhode Island were "Open Territories" serviced by CCR, Panasonic was authorized under the terms of the Agreement to permit other entities to sell Panasonic products in those regions. Agreement, ¶1.2. Accordingly, the

14

court finds that CCR has failed to demonstrate that it is likely to succeed on the merits of its breach of contract claim at trial.

C. Breach of Implied Covenants.

The principal focus of CCR's argument is that Panasonic acted unreasonably and in violation of the implied covenant of good faith and fair dealing when it divested CCR of the Massachusetts and Rhode Island territories, and awarded them to ERC. "Under New Hampshire law, every contract contains an implied covenant of good faith performance and fair dealing." Renovest Co. v. Hodges Dev. Corp., 135 N.H. 72, 81 (1991). New Hampshire courts "have relied on such an implied duty in three distinct categories of contract cases . . . ." Centronics Corp. v. Genicom Corp., 132 N.H. 133, 139 (1989). The third category, which is relevant to this action, encompasses cases dealing with "limits on discretion in contractual performance." Id. In such cases, "the obligation of good faith performance . . . exclud[es] behavior inconsistent with common standards of decency, fairness, and reasonableness, and with the parties' agreed-upon common purposes and justified expectations." Id., at 141. The Centronics court observed that prior cases addressing this

15

implied covenant of good faith and fair dealing illustrated a common rule:

> [U]nder an agreement that appears by word or silence to invest one party with a degree of discretion in performance sufficient to deprive another party of a substantial proportion of the agreement's value, the parties' intent to be bound by an enforceable contract raises an implied obligation of good faith to observe reasonable limits in exercising that discretion, consistent with the parties' purpose or purposes in contracting.

Id., at 143.

Here, CCR argues that Panasonic "exercised the purported right of discretion [to expand, contract or remove CCR's `Open' and/or `Prime' territories] arbitrarily and capriciously and without regard for CCR's legitimate interests." Verified Petition for Preliminary and Permanent Injunction, Count II at ¶52. Plainly, the Agreement vests Panasonic with discretionary authority to change the status of territories from "Prime" to "Open," and vice versa. It also grants Panasonic the authority to withdraw territories from CCR in their entirety. Agreement, ¶1.2 The next question to be addressed is whether Panasonic's exercise of its discretion exceeded the limits of reasonableness. The New Hampshire Supreme Court has noted that, "The answer to

16

this question depends on identifying the common purpose or purposes of the contract, against which the reasonableness of the complaining party's expectations must be measured . . . ." Centronics, 132 N.H. at 144.

Certainly the primary objective of the Agreement was to maximize the sale of Panasonic products within the territories awarded to CCR.  It is against that backdrop that Panasonic claims to have properly exercised its discretion in removing the Massachusetts and Rhode Island territories from a dealer which, despite its facially impressive gross sales activity (largely due to one substantial client, Fuddruckers), had failed to implement the type of focused and aggressive marketing strategy which Panasonic desired, and failed to hire the sales staff Panasonic deemed necessary to accomplish the job it wanted done.

Beginning in 1991, Panasonic repeatedly urged CCR to hire additional sales personnel to work the Massachusetts and Rhode Island territories.  In fact, in July of 1991, CCR acknowledged that, "Time is running out.  If we do not start to deliver immediately, we will give Panasonic no alternative but to find someone who will."  Defendant's Exhibit 3.  And, in August of

17

1992, apparently dissatisfied with CCR's performance, Panasonic reclassified Massachusetts as "Open" rather than "Prime" territory. It also repeatedly directed CCR to submit a business plan aimed at addressing Panasonic's longstanding concerns. From Panasonic's perspective, it had given CCR notice of its concerns and repeated opportunities to address them. Only after doing so, did Panasonic begin the process of searching for another dealer for the Massachusetts and Rhode Island territories.

CCR urges the court to limit its focus almost exclusively to Panasonic's conduct toward CCR in August and September of 1994, when Panasonic -- initially without the knowledge of CCR -- began searching for another entity to assume the Massachusetts and Rhode Island territories and failed to honor its pledge to meet with CCR in Chicago before making a final decision.

Panasonic's decision was apparently made based upon its perception that CCR had failed, since as early as 1991, to address substantial concerns identified by Panasonic. CCR's response that it was unreasonable to withdraw Massachusetts and Rhode Island from a dealer who had exceeded its annual sales quota misses the mark. Plainly, Panasonic could reasonably have

18

believed that those quotas would have been exceeded to an even greater degree [or could have been substantially adjusted upward] had CCR responded adequately to its requests and more aggressively marketed Panasonic's products with a larger sales force and to a more diverse group of customers. The mere fact that CCR met or exceeded the annual sales quota established by Panasonic did not (nor will the court hold that it should) limit Panasonic's discretion under the Agreement to also demand responsiveness of a different kind from CCR, or to explore the possibility of finding a dealer who might more adequately address Panasonic's general business concerns regarding market penetration and broad sales activity.

There is no evidence that Panasonic was motivated by anything other than its long expressed desire to achieve greater sales in the Massachusetts and Rhode Island markets. And, only after giving CCR a reasonably fair opportunity to implement procedures aimed at realizing that goal, did Panasonic decide that CCR's motivation, efforts, and willingness to accept business risk by employing additional sales persons were insufficient.

19

Plainly, Panasonic did represent to CCR that it would have one last opportunity to meet with Panasonic representatives in Chicago before any final decision was made with regard to the Massachusetts and Rhode Island territories, and it is not to Panasonic's credit that it reneged on its word. However, after meeting with representatives of ERC, Panasonic claims it became satisfied that holding such a meeting for the purpose of further considering preservation of the status quo would have been futile; ERC presented a proposal Panasonic did not want to pass up, especially in light of CCR's frustrating history of unresponsiveness. Panasonic's failure to honor its promise, even when viewed in light of the other evidence presented by CCR, is simply insufficient to support CCR's claims, because that promise will not likely be proven to have been intended as, and did not likely constitute, an oral modification of the contract terms, and, Panasonic's evidence is persuasive that even if the meeting had been held, the decision would have been unaffected, and, finally, because under the Agreement's terms Panasonic was entitled to modify the assigned territories for any rational business reason satisfactory to it.

At this juncture, the court is unprepared to find that CCR is likely to prevail on the merits of its breach of good faith claim. In light of the facts presently before the court regarding the history of the relationship between CCR and Panasonic, Panasonic's repeated representations to CCR that it must hire additional sales staff and market its products more broadly and aggressively in the Massachusetts and Rhode Island markets, and CCR's failure (from Panasonic's vantage point) to meet those goals, the court cannot find that Panasonic breached the implied covenant of good faith and fair dealing, although it must be said that Panasonic could have better handled the situation.

IV.  Conclusion.

Stated succinctly, CCR has failed to demonstrate that it is likely to prevail on the merits of its claims at trial with sufficient force to warrant the extraordinary relief of an injunction. Accordingly, plaintiff's motion for a preliminary injunction (document no. 3) is denied.

SO ORDERED.

_____
Steven J. McAuliffe
United States District Judge

January 31, 1995

cc:  Peter S. Cowan, Esq.
     Martha V. Gordon, Esq.